Good afternoon. Illinois Appellate Court First District Court is now in session. The First Division, the Honorable Justice Michael B. Hyman presiding, case number 21-0856, Kimberly Nelson v. Retirement Board of Police Annuity & Benefit Fund City of Chicago. Thank you very much. I'm Justice Hyman. With me is Justice Amelia Kuczynski and Justice Carl Walker. We're going to conduct this as if we were in the courtroom. Each side is 20 minutes. The appellant, you can reserve whatever time you wish for rebuttal, and we probably will interrupt you in the course of your argument. If we do, please finish your thought, and if you would go on to our question. That's the reason for our argument is for our questions to be answered. So each of the appellants, introduce yourselves. I see there's two appellant counsel. Are you going to split the argument, or is one of you going to argue? Yeah, we're going to split 10 minutes and 10 minutes, if that's okay with the court. That's fine. Do you want to reserve some time for rebuttal? That's good. Yeah, I guess we would like to reserve five minutes for rebuttal. That would be, I would go about seven minutes at the beginning, and co-counsel would go about eight, and then I would do the rebuttal. Okay, we don't have, we don't stay real close to the clock. We don't have a minute here, so don't worry if you're not, you know, more important you answer our question. Appellee, please introduce yourself. Appellee, I'm Mitchell Klein for the, I mean, an attorney for now, Donald Shea for the appellee as well. Okay. Good morning, Sarah Baikman on behalf of the Policeman's Annuity and Benefits. You have the rebuttal. I thought they were the appellant. I'm sorry. We don't mind, your honor. We don't mind having you. Take that back. You get the rebuttal. Go ahead. I would like to reserve probably five minutes for rebuttal. I don't anticipate taking the full 20 minutes. I fully recognize that the court has read the briefs and understands the underlying issues here, so I have presented a few remarks, but I think it'll probably only be about five to ten minutes, and then I'm happy to take any questions, of course, along the way, and I do want to apologize. I am 37 weeks pregnant, so if I seem short of breath at any time, I just want to apologize. Everything seems to be a little bit harder these days, and I am going to sit during the duration of my comments, if that's okay. I don't mean it as a sign of disrespect in any way, shape, or form, but it's a little easy. One of the advantages of Zoom is most voices sit, so, and congratulations to you, and if you need a break or anything, no worries. We're very easy on that, so whatever is comfortable for you. Thank you. I appreciate that. If no one has any questions, please proceed. Great. So, like I said, it's an honor to be before you this afternoon. My name is Sarah Baikman, and I represent the Policeman's Annuity and Benefit Fund in this matter. I am going to, like I said, just mention a few facts and arguments that I think are relevant to the issue before you today, but I do believe the majority of our points are outlined in the brief that we started before. So, first, I want to highlight the fact that it's undisputed that Ms. Nelson is entitled to a duty disability benefit based on this court's prior April 24, 2020 order. I also want to note that the board followed this that Ms. Nelson wants to be awarded a duty disability benefit, which occurred at a subsequent board hearing at its June 26, 2020 meeting. Ms. Baikman, I'm going to stop you right away and just ask, do you all disagree on the standard of review here? I'm just trying to see if at this point, if anyone has had any kind of enlightenment on that, and if that position has changed with either one of you. I don't believe, we continue to assert that it's the manifest way to the evidence, Your Honor. I think it's analogous to what the appellate court considered in the Samuels decision, and so when viewing the evidence under that standard, this court has a duty to uphold the board's decision in the event there's any evidence in the record that supports that decision. So I don't think our position on manifest way to the evidence has not changed. Your Honor, we, there is a, I'm sorry. No, I'll ask you the question when it's your time. Okay, I'm sorry. No, that's okay. But I have a question for Ms. Baikman, if you don't mind. We've read your, the briefs in this case, the record in this case, the appellate court decision that was entered by Justice Nickla and her colleagues. I want to know if the board in the first trial before Justice Nickla's opinion, did you raise 154 AI? No, ma'am. The analysis, the analysis was specific to whether or not Ms. Nelson was entitled to a duty disability benefit or a coronary disability benefit. Okay, and did you raise 154 AI in the first court set of hearings before the first appeal? No. No. And again, I, yep, I apologize. Okay. Again, it was specific to whether or not she was entitled to a duty disability. You didn't raise 154 AI in the first appeal before Justice Nickla either, right? Correct. Okay, but you have in this court and in this appeal, you've raised it in the briefs. You raised it in the trial court? Yes. Okay. Yes. So, so what happened procedurally is, um, originally Ms. Nelson applied for a disability benefit. Uh, the board awarded her an ordinary disability benefit, finding that her disability at that time was not related to an active duty or in the performance of an active duty. Um, that was affirmed by the trial court and then reversed by the appellate court and it's April 24th, 2020 order. That decision was then remanded back to the board. The board awarded Ms. Nelson then consistent with that order, a duty disability benefit. But then at that time, analyze what benefit is she is entitled to under that duty disability section and included that she was entitled to that benefit at the 50% level, which is the psyche. And that's because we're AI. Excuse me, just Mr. Yes. Thank you. Go ahead. And that decision was based on 154 AI. The board's decision at that round of hearings. Correct. Yes. Okay. Thank you. Okay. Great. So coming back to that same question, Ms. Baikman, the appellate court in its previous decision, and that was a different panel of this court. Uh, none of these justices were on that panel, but that panel did address that issue. However, as to whether or not, uh, the benefits, whether or not the, the, the current condition was related to or connected to the prior psychological issues, is that not correct? Uh, I would argue that, that no, uh, they analyzed under, uh, the ordinary disability statute and the duty disability statute, whether or not the current injury or the current disability, um, was caused in the performance of an active duty. And that's the, really the first prong of 154. And so what I would, I would argue is the appellate court did analyze that first prong of 154 to determine, Hey board, you got it wrong. The first time it, this isn't an ordinary, this is related to her performance in an active duty, but the general assembly actually has it. So that article five is a little bit different than for instance, firefighters, article six of the pension code in so far as after you make the determination that someone's entitled to a duty disability benefit, the analysis doesn't end there. Then you have to determine whether or not there's a pre-existing physical, mental, or disease, uh, condition in the record, um, that, that, uh, that stems to or aggravates the case aggravates, uh, that pre-existing condition in such a way to qualify or, or, or spring into effect that disability that then qualifies that person for a 50% duty disability. And in the prior decision, the other panel of this court addressed that in paragraph 43 of their decision, but he also addressed it again later on in, uh, paragraph 44. And, uh, again, later in the decision as well, uh, in paragraph 50. So, and I know you're probably not prepared to address all of those questions, but the board, the, that the, the other division of this court, the other panelists should say clearly address the issue. And they made a finding that, uh, the current PTSD condition was not related to the other psychological issues. They, they actually made a finding that those issues have been resolved. Well, I would just, so I would just point out that the Samuel, the Samuel's decision reviewed the exact same scenario. They said in that case, the underlying pre-existing condition has been resolved that it didn't cause the disability. In fact, the officer was working during that entire period. It was only until that on-duty injury that the individual became disabled. And I would just note, you know, the appellate court is talking about causation here for purposes of determining what disability benefit is awarded, ordinary or duty. And the Samuel's court, the appellate court in Samuel's said, importantly, the term resulted from in that second prong analysis of 5-154 does not imply causation, rather exasperation of a pre-existing condition. They spec, they specifically used that term that I, that I noted stems from. So while I, I recognize that those paragraphs, uh, cause pause and I totally recognize that because they do talk about causation. The causation that the appellate court was reviewing, I believe, and what I've argued is the causation about whether or not the injury is, is from an on-duty incident or it's unrelated to on-duty. And, and they determined that it was related to a duty incident and that a duty disability was appropriate. Right. But, but Ms. I want to stick with this case because I'm concerned as to whether or not we're not dealing with a situation where we're talking about the law of the case. Okay. And whether, whether this panel agrees or disagrees with the prior decision is not an issue. If it's the law of the case, we're bound by it. So, and that's what I want to kind of get to. And I know you didn't argue that in your brief and no one did, but I may as well throw it out because I'm struggling with it. I understood. And it gives me pause too. So I, so I understand, I completely understand your point. I would argue though, that I don't think, I don't think they're inconsistent or mutually exclusive. So when you look, for instance, at the paragraph 43 that you cited at the appellate court's decision, um, it, I think the sentence that gives you pause and the one that gave me pause, moreover, the facts that Ms. Nelson, the fact that Ms. Nelson may have been susceptible to PTSD does not change the fact that the cause of her current condition was the events of December 8th, 2016. So again, that's under the analysis of does she receive a duty disability benefit or an ordinary. Once you've determined, which the appellate court has here, that she's entitled to that duty disability benefit based on that the current condition was the event of the court in this instance, because all they had in front of them is whether or not she was entitled to an ordinary disability benefit or a duty disability. I agree with you that the analysis does not stop there. And so you're a hundred percent correct. But the problem that I'm having is did the appellate court already conduct that further analysis? And I understand your argument is no, they didn't, because that was not an issue that was before them, but it seems as though they may have. And I think we, we've got to try to resolve that. Understood. Um, and I think the way that you resolve that is if you take what they've said in this and then apply it under that analysis under the second prong of 154. I agree with you again, but paragraph 50, uh, the very we have the same issue. They repeat it again, but let me see if I can focus it a little bit. This question in a period of 52 and 51, or excuse me, 53 at the end, uh, they reversed the circuit court and the decision, the pension is set aside. So, uh, they don't say anything about being remanded. I mean, does that mean the case has ended? Apparently not because there wasn't a further, uh, proceeding. Right. But I just want to point out that there was nothing in paragraph 54 that says that any other proceedings should proceed. Does that have any effect? How should we interpret that in Europe? I think that's a great question. That is a great question. I will, I will note that practically, I mean, what happened is it was remanded back to the circuit court, which then, you know, asked the board to, it remanded it to the board issue. That panel did not say remand. Usually I barely have seen a case where if we say you're done, you're done. If we see remand, it's not done. And if, if it's unclear, we would be, every case would go back. You know, if we didn't say the word, uh, only when, when it's remand, does it go back? Otherwise the case is over in my, I mean, that's one view. I'm just saying in this circumstance is maybe there's something I'm missing. I'm just trying to, to look at that. Right. Although I think the devil's advocate argument on that would be then shouldn't they have said that if, if, if justice Walker is correct and they they've reviewed this or his point is taken to its conclusion that they've reviewed the issue of, of what benefits she's entitled to under one 54, not just that she's entitled to a duty disability, but that she's entitled to the full 75%. Wouldn't they have said that when they said for the reasons stated above, we set aside the board's decision in order that Ms. Nelson be awarded a duty disability benefit at 75% of her salary. Well, it was your original question. So the reason, the reason why it wasn't necessary is because if you go back to their analysis and they speak about the two different possibilities, they only give you two possibilities. And that is either she's going to be awarded 50% ordinary disability or she's going to be awarded duty disability and which is at 75%. And that's in paragraphs 36 and 37. Right. Of the order. And so they, they end by simply saying that she's awarded duty benefits, which implies that she's awarded the 75%. Now I agree with you that they should have said it, but I still think just the time this question is a great question because had it been a remanded, then that means it's going back to the board for the board to do something other than follow this court's order, but maybe conduct further analysis, have a second hearing, even call additional witnesses. But when a case is not remanded in the, in the, this court simply gives an order back to the board or to the trial court. The only thing left for the board or the trial court is to follow this court's order. Unless that order is appealed to the Illinois Supreme Court. We all agree this case was not appealed to the Illinois Supreme Court. So that's where I struggle with whether or not it becomes the law of the case. And I'm not saying that I disagree, that I agree with what the panel did. I'm not saying I agree with it at all. I agree with you that there's further analysis there, but it seems like they conducted that analysis and it doesn't matter whether they, that analysis, whether I agree with their analysis, nobody appealed the decision. I caught into the final order. So I want you to help us with all of that. And I think we're, just in time, it's probably giving you extra time here because we want to do the right thing here. Okay. So the MICFA panel said she gets duty disability and that they, and they never mentioned 154A1. And then the board held another set of hearings about that duty disability. So did anybody complain at that point that the board had no authority to do that? Mr. Klein, let me step up and ask you that question. I mean, did anybody say to the board when they started the second article and say, wait a minute, you can't do this. It's not remanded to you. You have no authority to have another set of hearings. What are you doing here? I'm not seeing anything like that in the record either. So on the one hand, the board didn't appeal the MICFA decision. On the other hand, I'm not seeing, it may have and her team appealed or objected to the board having a second round of hearings. So I think the board was not treating it like it was a law of the case. And if there was no objection to the board during the second round of hearings, then I'm not seeing that Ms. Nelson was treating it as a law of the case. Now, maybe that side of him was there, but I'm seeing gaps in both of all of this process. And the critical factor for me is who was paying attention. If anybody was paying attention, when somebody paid attention to 154, if you won, did that happen anytime before it was in the argument at the second trial court level and at the second appeal, which is the one that we have in front of us. I could not agree more. It was not analyzed or reviewed until the issue before the appellate court, as Justice Walker highlighted, the two sites that they cite to when they're reviewing what they're looking at are whether she's entitled to an ordinary disability benefit or she's entitled to a duty disability benefit. So their analysis is solely under that. Is she entitled to one or the other? Once there was a determination that duty disability benefit, there is that second layer of analysis, which the appellate court could not have considered at that time because it was never before them. I would point out paragraph 35 of their order when they start and they just say Ms. Nelson's primary argument on appeal is that the board's finding that she is not disabled because of an injury that occurred in the performance of an active duty was against the manifest weight of the evidence, period. That analysis is just whether or not she's entitled to duty or ordinary. Once the appellate court determined that she is entitled to duty, that additional step, which I think Justice Walker recognizes needed to occur as far as what level is she entitled to under 154. I think he has some concerns, which I understand that the appellate court seems like they discussed some of that in their analysis of whether or not she's entitled to ordinary or duty, but they really didn't because it wasn't before them. That second layer of analysis was required because the board didn't make that finding either. There's nothing in the original record about the board's findings with respect to whether or not that preexisting condition, how it was analyzed under that second prong of 154A1 because they were still trying to determine whether or not she was disabled because of an injury occurred in the performance of an active duty. They ultimately originally decided she wasn't and they awarded her an ordinary. But then once that was overturned and there was a conclusion that she is entitled to a duty disability, you still had to go through that as a fiduciary under the law. They still had to through that second analysis about what she was entitled to under 154, specifically under A1. And when I think you look at that analysis under A1, particularly the Samuels case, which I know we didn't focus on and I recognize why, but when you do do that analysis, there is sufficient evidence in the record to support the board's conclusion on that second round that Ms. Nelson was entitled to a duty disability benefit at 50% of her salary. Whether there's a citation specifically to A1 or not, there was not. We've agreed to that. Putting that to a side, let's not look at the terms, let's look at the substance. And if you look at the substance, then there is an argument. I'm not saying whether I agree with it or not, but I'm asking you. But there's an argument that could be made that, as Justice Vargas at law the case, this case is over. And there was no jurisdiction for anything further because the MICVA panel decided that the issue without mentioning A1, but decided it was not at 50% by implication of their ruling and by the fact that it wasn't remanded for further hearings. If they hadn't thought of that, then they would have remanded it. They wouldn't have said that this is the end of the line. What's your response to that? Yeah. My response is against, and I apologize because I feel like I'm sounding a little bit like a broken record, but I do think that they did not detail whether she was entitled to a 50% or a 75% benefit, a duty disability benefit, because they didn't analyze that issue because it wasn't before them, because that's not the issue that was on appeal. Because otherwise, I think the other way to think about it is, assuming someone was, I don't know when you would ever, in an appellate court context, then analyze that second prong of 154 if you've made a determination that the person is not entitled. It's sort of like the argument is by making the distinction that she's entitled to a duty disability over an ordinary disability, which the because that's the issue that was in front of them on appeal. There's no requirement to do that second analysis because it's inherent in the analysis of whether or not she was disabled because of an injury that occurred in the performance of an active duty. That's not the case because otherwise there would be no need to have that second subset or that second prong of 154. So there is that extra element of analysis that's separate and apart from the analysis of whether or not Ms. Nelson was injured because of an injury that occurred in the performance of an active duty. And I'd like to go ahead and leave this issue and go more to the merits. Because I understand your argument. First, let me ask this. To me, it's a yes or no question. The question is, you agree that Officer Nelson, at least after the December 8th incident, had PTSD, correct? Correct. Okay, and that's what I expect you to say. Okay, so now here's the question having a deep dive into the records. And I did not see anything prior to December 8th with regard to her mental situation, we'll call it. But before that incident, there was the first time was after this. Now, there was some kind of mental issues raised by Dawkins, Dr. Dawkins, who luckily we had all through this, this case. So, so the same doctor, which is fortuitous that we have the same doctor having seen this individual for several years. Yes, but, but Justice Hyman, Dr. Dawkins specifically said in 2017, that the PTSD was complicated by long standing mental problems. I'm getting there. So, you would also agree that PTSD is only one of hundreds of mental disorders, correct? Correct. Okay. And as in the Samuel's case, where that case had to do with a back injury and a degenerative disc disease in the back. So, there's a relationship there. Now, here, PTSD is a different disorder than anything she had prior. Agree or not? It's a separate diagnosis. But I would argue that the record supports a finding that the long standing psychological issues complicated by long standing mental problems. But that's complicated. Sure, it's complicated, but it wasn't PTSD. There are hundreds. The DM, DVM, you know, the medical records regarding mental disabilities and illnesses has hundreds of different things that people have. And you would say that because somebody has a back injury, that that's a pre-existing condition with regard to a knee injury? Is that, I mean, or is that a pre-existing condition with regard to losing an That's my question. There is a difference. It seems to me what you're doing here, which is not in a very carefully worded reports by Dr. Dawkins. There's nothing that says that she had PTSD before. In fact, she goes out of her way to say how the differences between what she had before and what happened after. And it seems that you're just saying mental disorder is mental disorder. Is that your argument? No, again, I would say that the record with Dr. Dawkins, some of which we cite in our brief, that Dr. Dawkins conclusion is that that long standing mental problems, the long standing psychological issues, they were exasperated by that incident causing that disability. And under the Samuels analysis, which you cited, the resulted from in that second, that A1 analysis doesn't imply causation. It is the exasperation of a pre-existing condition. Let's look at the exact words you're talking about. I'm going to go back to the 23rd, 2017. Here's what she said. Officer Nelson suffers from PTSD, which can be directly attributable to the duty events, which occurred from the incident in December, 2016. That seems to conflict with what you just said. She says directly. Doesn't it say indirectly? Doesn't say anything about anything before that? This is her conclusion. The PTSD is complicated by, but that's like somebody having an injury to their back and then having an injury to their knee. It could complicate the back. So, I mean, there's, again, it seems that we're talking about PTSD here, which we all agree. And she had other problems before that. And one, like pieces of the body is different than the other. And I agree. I do think anytime we're talking about a mental condition, it's going to be a more difficult discussion than it is when we're talking about your back, right? It's easy to look at a report about your back and degenerative distance. I would note that if we get off of Dr. Dawkins for a second, the mental condition, and I fully recognize the PTSD diagnosis for the first time occurred after the incident. But I would note that the mental condition, some of that long standing psychological issues that were cited in the record did mirror the complaints that the applicant had in her PTSD, which ultimately led to her PTSD diagnosis. Feelings of isolation within the department, you know, emotionally fragile states, things like that. So, again, when we're looking at mental health, I do think we have to look at it differently than we do a back, which I agree. And that all mental health conditions are a little bit unique and nuanced. And I recognize that. But I think if you take what you're saying, sir, to its logical conclusion, that a mental health condition could never, unless it was a PTSD diagnosis made previously, which Samuel says, you know, there doesn't have to be anything in the record before that. There just has to be a conclusion at the time of the injury, that there was a pre-existing condition that exasperated, that was exasperated by the on-duty injury. It doesn't use the word exasperated. The word exasperated is not in the statute. Okay. What he did say was the long standing physical issues exacerbated by the events in 2016. He also said complicated by long standing mental problems. So, yes, he said, yeah, she has PTSD, but he also referred specifically to ongoing mental health issues that she has had. So, this fits exactly with the language of 154A1, a pre-existing condition that is exacerbated by a condition that already exists. And, you know, I don't know how we get around that. And I apologize. I was using the exasperation in the context of Samuel's analysis. Okay. Any other questions? Okay. Hearing none. Thank you. You'll have your vote. Thank you. Mr. Kline, unmute yourself. Mr. Kline. Thank you. As far as some of the issues that were just raised, I know Justice Pazinski about how we responded when the board, after the Justice Mikva decision, that the board brought up this new issue that they believe is new. My response was a petition for review. As far as specifically referring to the Mikva decision, I thought that would be delicate because it was unpublished. So, that was my thinking at the time. I thought the right response was the petition to review the board's decision. But you do understand, Mr. Kline, that under Rule 23, even the old version of Rule 23, you can always cite a decision, which is the law in the case. And there's other reasons you can cite a decision, also double jeopardy and so forth. And actually, I reviewed the case pretty carefully, and I felt the Justice Mikva's decision, as far as specifically on this issue, basically, I would agree with the board that because it didn't specifically refer to it, I thought I should respond with a petition. I certainly also would point out, and I think it was addressed, that in the first case before Justice Mikva, the board made very similar arguments as they made in this case. They tried to state, their facts and their argument was that events prior to the December 26th injury were significant. And that was basically the same argument they're making here. So that's, I think, undisputed as far as the arguments they made in the first case were certainly the same in this case. As far as the Samuels case, I think a very critical difference regarding, I think Justice Hyman referred to that, that not only was it one case, in our case, it's mental issues, that case was a physical injury, but also in that case, the key issue is degenerative. And as far as degenerative is a deterioration until you would continue up to the date of a new event or a new injury to the same body part. In our case, there's nothing at all that shows any kind of continuation. I think it's very clear that the last treatment that Officer Nelson had prior to the December 26th injury was in 2014. And in that case, Dr. Michelson stated in May of 2014, two and a half years before this injury, and she was the medical person to diagnose, there was nothing after May of 2014. And in that case, her report says there were no indications of current psychological distress. And as far as the only, the report of Dr. Dawkins was two years before that. So as far as, and even, uh, so as far as whatever Dr. Dawkins said in 2012, I think Dr. Michelson's report would certainly be more significant because it was two years later. Dr. Dawkins report in 2012 was the last report she did prior to the December 26th injury. Her next report is 2027, about six months after the key injury. And there she first time has been addressed was the first time that PTSD came up. And as far as the statute, I think a couple of things are significant. And also the de novo issue. But as far as what the code says, an active police officer who became disabled on or after the effect of date as a result of injury deserves 75%. And as far as any type of preexisting condition, I think basically would be trumped by this, this language that says being no medical report at any time since Michelson 2014, it's hard to make a conclusion. Let me give a hypothetical to try to get to your point. A police officer served in the military and had PTSD as a result of that service. And then in the December 8th incident occurs, PTSD. You're the board. 75 or 50? I would say 75 because the prior condition that you described in the military, if there's nothing in between, as far as there's an event without going into the exact number of years, but if there's no type of PTSD within three years of this injury, I would say those facts would still support the 75% because is, and that would be, is there a case in your life? No, I just would be the issue about continuous. I think that's the key. And as far as the preexisting issue, I think that's significant. And I think this goes to the de novo issue, as far as interpreting the language, a mental disorder, which existed at the time the injury was sustained. And the board is saying it's preexisting, even though there was no diagnosis since Dr. Michelson's diagnosis in 2014. Right. We can't ignore Dr. Dawkins' final report. If you want to get to the merits, let's do that. And her final evaluation, which was conducted on November 9th, 2017, Dr. Dawkins determined that officer Nelson was still unfit for duty and had long standing, and Justice Patinsky read this earlier, long standing psychological issues that were gestured by the incident of December 8th, 2016. So the point being is that it's not this single incident that all of a sudden now the injury occurs and therefore it's an injury. It brings us back to the part I, which says that if a disability resulted from any physical defect or mental disorder or any disease which existed at the time the injury was sustained, then she's only entitled to 50% total disability. And that's exactly what Ms. Beckman is arguing. And I think this flies right into her argument. And the case is solid for her if we were to look at Dr. Dawkins' final report. A couple of comments, Justice, would be one, Dr. Dawkins, with all due respect to her, it's a conclusion. And I would state that her prior report was 2012. Are you now saying that we shouldn't be relying on Dr. Dawkins because she seems to be the star here for your case? Is that what you're saying, that you're discrediting her? Well, I would just, when she's referring to past medical, mental issues, I mean, I think it's consistent. She says she has a direct diagnosis, a specific diagnosis that PTSD did not occur until after. As far as I would agree with her, there were prior, there was prior mental illness. So basically, what I would disagree would be the significance of the prior mental illness. If there's nothing, no type of mental diagnosis since 2014. And what supports that is the attendance records of the police department. That for, she, Dr., Officer Nelson did not miss any work for a three-year period prior to the December 26th diagnosis for anything relating to any type of mental issue. So that supports and affect the last diagnosis prior to the December 26th injury was a report by Dr. Michelson, and it says she's fit for duty. So that was two years after Dr. Dawkins' 2012 report. Well, wait, she, Dr. Dawkins singled out emotional outbursts on duty. So she was at work when that was happening. Dr. Bricker in 2012 said she was emotionally fragile. So you can go to work and be emotionally fragile. She was, Dr. Michelson said she had anxiety disorder. That was in 2014. Yeah, there's a history of actual people who are trained to recognize these things, putting names on them. So you can't say there were no names on them. There were names on them. And they did, obviously, they're called as witnesses or called as evaluators to give their opinions, their conclusions. So saying, well, we can't pay attention to Dr. Dawkins because it's a conclusion. Well, this is what it's a conclusion. Just responding to that, as far as what Dr. Dawkins said in 2012, I think would be less significant or have less weight than what Dr. Michelson is saying in 2014. So Dr. Michelson's report is two years after Dr. Dawkins. And she said, Dr. Bricker, what I just brought your attention to is what Dr. Dawkins said in 2017. Right. So you're discrediting what she said in 2012. And you're going to now look to what Dr. Michelson said in 2014. But I'm pointing to what Dr. Dawkins said in 2017. Dr. Dawkins, in this case, was almost equivalent to a primary care physician. She spent more time with her than anyone of all the doctors. In fact, Dr. Hirst is discredited by the prior decision of the appellate court because he only saw her one time. Dr. Dawkins saw her more often than anyone. And I'm looking to what Dr. Dawkins said in 2017. So in the merits of this case, I think there's trouble for you. Well, responding to that, Dr. Dawkins, Dr. Dalton says in 2017, that the first time PTSD was diagnosed was after the December 26th injury. As far as what Dr. Dawkins also says, that there were prior mental issues. That's not disputed. It's just the prior, anything significant, as far as Dr. Dalton's report in 2012, I think would have less weight than a report. Dr. Dalton saw Officer Nelson a week or two, or a month or two, or six months before the injury of December 2016. Then the preexisting argument would have- All these things that we're discussing right now, these are factual issues, which the board has decided. And as Ms. Fakeman said early on, we do give deference to the board's decision on these factual issues. So if the board has already ruled on these issues, then the question that comes for this court is whether or not there's evidence in the record to support the board's decision. If there's evidence in the record to support the board's decision, we should be affirming the board. I realize that the trial court reversed the board, but for a different reason. Not because the trial court necessarily found that the board's decision was against the manifest way of the evidence. The trial court reversed the board because the trial court believed that the appellate court in the first decision, the mixed decision that you referred to it as, had already decided that issue. But now you're arguing, we're at the merits now. So we're not dealing with the legal issue of whether or not the first panel decided the issue or whether or not that's the law of the case. As we go to the merits of the case, we get to a point where, well, is there evidence in the record to support the board's decision? Certainly what Dr. Dawkins said supports the board's decision to some extent. Certainly what Dr. Hurst said supports the board's decision to some extent. There's clearly evidence in the record to support the board's decision. So you can explain for that. Now let's- Yes. Well, first, I think you're describing the manifest weight issue. And I would argue that there's also a strong evidence for de novo because it's really interpreted- None of you have argued. I don't mean to cut you off, because I'm not a rude person at all. But none of you have argued what the true standard would be. When you're revealing the decision of an administrative agency, such as the board, if there is a mixed question of both fact and law, then it's a clearly erroneous standard of review. And neither one of you, neither side has addressed that or even recognized that there's another standard of review out there. That's why I started with that issue, because I thought someone would have done some research and realized that there's another standard. And that standard is whether or not it's true. I did in our brief talk about the mixed standard. But as far as I think it's- To me, as far as interpreting the statute, the key issue is ambiguity. And I think- So the basis for a de novo review is- Our view about pre-existing is that if it's three years prior, it's not pre-existing. The board's issue of pre-existing is that even though the last review was earlier, that could be pre-existing. And I was saying that when they keep citing Samuels as their key case, it's clearly pre-existing in Samuels because you have a deterioration that goes up until the date of the new- as far as degenerative. And in our case, there's certainly nothing degenerative. She's been working. She was working. She was able to work right before. There's no evidence of any type of mental issue. In 2014, the last doctor that saw Officer Nelson says she's fit for duty. So as far as the manifest weight issue, I would say as far as all the significant evidence, I think the case law that they support as far as the Goodman case, I think what's significant regarding the manifest weight issue, if the court decides that it's not de novo, but I think I indicated why we believe it is de novo. But as far as the manifest weight issue, I think what's critical is that one, unlike the evidence of the degenerative condition, so that would certainly contribute to the manifest weight issue. And in fact, the only evidence would show the opposite of degeneration because what Dr. Dawkins said in 22 is different. Dr. Dawkins says in 2012 that Officer Nelson is unfit. And in 2014, Dr. Michelson says she is fit. So that would show the opposite of deterioration. And as far as the manifest weight, it's clear that she was not working for three years prior to the injury. So as far as basically we believe, and I think the facts show that there's no credible evidence that shows a preexisting condition. Any other questions? Well, I just want to point out that I'm not entirely sure I agree with Mr. Klein. In 2012, Dr. Bricker said she was unfit for duty because she was emotionally fragile. And she requested relief from duty because she was overwhelmed by her duties. Then you go to 2014, Dr. Michelson, who says she has anxiety disorder. She was affected to maintaining her safety precautions. Then finally, you get to after the event, Dr. Dawkins in 2016 says she's unfit for duty. She's emotionally overwhelmed. She has emotional outbursts on duty multiple times. 2017, Dr. Dawkins says she has PTSD complicated by long-standing mental problems. 2017, Dr. Dawkins says long-standing psychiatric issues exacerbated by events in 2016. I think it is a long record. Well, it's long. I'm not disputing that, but it's not recent. I mean, the last Dr. Dawkins, the last time she saw Officer Nelson was 2012. The key injury here is 2016. That's four years later. It's 2014 by Dr. Michelson. That's two years before. Michelson, I think it's pretty clear says that Dr. Officer Nelson is fit for duty. So that's the last record fit for duty. So I think that as far as prior medical treatment would be insignificant compared to the last medical report that says fit for duty. And that's two years. Dr. Michelson also said she was fit for duty, but she's being treated for anxiety disorder by her personal physician. So she's taking something for it. Yeah, I do not dispute that. I do not dispute what you described as far as part of Dr. Michelson's report, but I just believe the key part of that report says fit for duty. If there aren't any other questions, your co-counsel, you were going to split the argument, but is there any, what is the issue your co-counsel is going to address that we haven't addressed? Well, I'm not sure exactly, but I think we're an opportunity to say this. So unmute yourself. Good afternoon. Can you hear me? Yes. Good afternoon. Thank you so much for I just wanted to say that my co-counsel has answered many questions, but I think the significant thing we have to understand here is in that 15 years that officer Nelson was dodging bullets and arrests and domestic cases and all kinds of cases, she went to work. None of these alleged prior existing anxiety disorder stopped her from going to work. The only thing that stopped her from going to work was an eye surgery and I believe an upset stomach for a couple of days, but nothing in the record indicates that she ever lost a day of work due to any psychological issues. And I think that's the message that we're trying to drive home here. The PTSD came after December 8th. PTSD and anxiety disorder are mutually exclusive, totally different disorders. Back to Dr. Dawkins in her July 23rd, 2017 letter, she said that PTSD is complicated by long standing mental issues. In that November letter, she says the PTSD is exacerbated by long standing issues, meaning the PTSD stands on its own. The other issues come in later and diagnosis after that December 8th, 2016 situation happened. She went to work. She dealt with her coworkers, whatever was going on at work. She didn't stop working. Since December 8th, December 9th, 2016, Officer Kim Nelson has not been at work. Now, as to this issue that the 50% that there was this second prong, at the time that that opinion, April 24, 2020 was issued, there was 50% ordinary duty or 75% duty, period. That's why they didn't remand it back to the trial court. They made a decision that it's 75%. And the board thereafter decided, no, we're not going to agree with the court. We're going to do our own little finagling at this meeting. And we're going to give her 50%, even though the appellate court indicated that she should have duty pay, which at that time, and it's undisputed in the record, is 50% for ordinary, 75% for duty. That was what the board was supposed to go back and do, pay her her 75%. Instead, they brought this 50%. And here we are, again, the appellate court was not silent. I believe they spoke very clearly about what they wanted for Kim Nelson. And that was that one duty 75%. Um, this honorable court stood tall for Tim Nelson, just in April 24 2020. All we're asking this court to do is enforce what the previous court decided. And that's 75%. She's not asking for 100. She's not asking for 50. She's not asking for 60. She's only asking for what the statute indicates she is entitled to. That's all she's doing dodging those bullets, dodging that that person that robbed that guy. And she ended up with that guy in her car, dodging robbers. That's all she's asking for. She's not begging. Yes, ma'am. And good afternoon. There's no evidence that she ever came in contact with the alleged robber. She went into a very dangerous situation that you and I most likely wouldn't go into if she wasn't an officer. Excuse me, there is evidence that the victim approached her car when she saw her car. Yes, I'm looking for the offender. Yeah, find him. Yeah. But to imply that somehow she was in danger from this alleged robber, that I think would be unfair. Do you have anything to add that has not been said by your counsel? I believe if I may have a moment, Your Honor, I just would like to indicate that I think that ultimately, I'd like to just say and thank you for being so gracious, Your Honor, that nothing that happened after the prior to December 8th Kim Nelson from working officer Nelson, she went to work. She worked doing her job every single day through whatever anxiety disorder she may have dealt with that had been resolved. She continued to work. It wasn't until that December 8 2016 issue that she has been out of work. They have knowledge that she had an anxiety disorder, which is a defined mental health condition in the manual. You acknowledge that she had different issues before 2016. So would it be reasonable then to have to take have a conclusion that the events of 2016 during which she encountered only the victim and not the perpetrator exacerbated her existing anxiety issues? Well, Dr. Dawkins said that the PTSD was complicated by long standing psychological. She also indicated that the PTSD was exacerbated by long standing issues, but there was no PTSD until after December 8 2016. That may be, but the definition in 154 A1 requires us to look at long standing issues and then something happens and then it gets worse. That's basically what it says. But the PTSD, but what I think what I may be missing is this. She didn't say that long standing issues were exacerbated by PTSD. She was very careful and the prior justice said it very carefully worded this thing. She didn't say prior anxiety disorder or prior long standing psychological incidences were exacerbated. She said PTSD in her July letter 13 2017 was complicated by long standing issues. That the PTSD was exacerbated by long standing issues. Couldn't we read that to mean that this doctor, Dr. Dawkins, who was really the last person to see her except for Dr. Hirsch, who's the board person, thought that she already had PTSD and that it was complicated. If she had believed that she had already had it, it would have been documented and it wasn't documented until I believe 2017. No way prior to 2017 was there any documentation of any PTSD. She was clear. She was clear. I'm so grateful to be here. Thank you so much for hearing my counsel and I. Officer Nelson is here. Again, just for the 75% that the appellate court in 2024, I'm sorry, April 24, 2020 ordered for her to have. All she's asking is that that order be enforced. And it has not been enforced. And we're asking that this court enforce the order, indicating that she was injured on duty, that PTSD was not prior to 2017, and that any other psychological issue exacerbated the PTSD, not the other way around. That's all we're asking the court to do. Thank you so much. God bless you and God bless America. Thank you very much. Thank you. You can proceed. Thank you, sir. I just have three quick points. I think you've heard a lot today on this case. First, I wanted to respond to Justice Walker on the clearly erroneous standard. I would just note that the clearly erroneous standard is also very deferential to the board's findings. If you believe that there is a mixed question of law and fact, I think the Seventh Circuit even has a quote that says under the clearly erroneous standard, you have to find that the board's decision stinks like a seven week or seven day old dead fish or something gross like that. So I would just note very, very quickly that I do think under the clearly erroneous standard, there is a similar level of deference given to the board's findings in this case. Second, I want to address the jurisdiction issue, which I think is really the main one that we've been struggling here today. I don't want to repeat what I've said in the past, but I do just want to highlight a few things from the appellate court's 2020 opinion, that being that they specifically note that what they have jurisdiction over is the circuit court's final judgment and Ms. Nelson's timely notice of appeal. And then they refer to the fact that Ms. is that the board's finding that she is not disabled because of an injury that occurred in the performance of an active duty. And again, then they analyze that and confirm that she's entitled to a duty disability benefit period. Again, I don't believe that they took that added step of the analysis of what that duty disability looks like under the statute, which is why the opposing counsel. And in that subsequent hearing, they awarded a duty disability consistent with the appellate court order. And then under the analysis of the record before them concluded that she was entitled to a 50% benefit based on 50% of her salary consistent with that second prong of the analysis. And then lastly, just on the merits, just very quickly, I would note that the Samuels case does emphasize the fact that the statute does not include language stating that even if an officer has a physical defect, mental disorder or disease prior to the subsequent on duty injury, the officer is entitled to a duty disability pension of 75% of salary. If but for the on duty injury, the disability would not exist. I think that's kind of the point that we were just talking about with the PTSD. It's not a but for analysis, but for that, that injury that occurred in December of 2016. The PTSD, that's not the analysis that Samuel says that we have to go through. It's looking at the record. And is there evidence in the record to support the board's conclusion that Ms. Nelson had long standing psychological conditions, many of which are described the same that they are in in 2017, as they were back in 2014, long standing isolation, feelings of isolation in the department, etc. Whether or not that was exasperated by that on duty injury to cause the disability. And that's exactly what Dr. Dawkins concluded in her 2017 report. I'd like to ask you to comment on paragraph 37 of the panel, where she says, conversely, a duty disability benefit is granted when I'll read it because I think it's very significant to this issue. An active policeman who becomes disabled on or after the effective date, as a result of injury incurred on or after such state in the performance of an active duty, has a right to receive duty disability, which he does not have a right to receive salary equal to 75% of his salary, his salary is defined in this article, at the time the disability is allowed. Right there, in this opinion, contrary to what you may have stated, is that what is being talked about in this case, the MIPSA decision, is 75% for a duty disability. And then you go down to the end. And it says, for the reasons stated above, we set aside the board decision in order to Nelson being awarded a duty disability benefit. So they didn't talk about, they talked about the 75%. And then they go into their reasoning and conclusion. So how do you reconcile that with what you just argued? Because again, the paragraph 39 through the end of the end of that last 53, all are dealing with whether or not Ms. Nelson experienced an injury that she experienced in the performance of an active police duty to then qualify her for that duty disability benefit. Again, I think their analysis is limited to the active duty, whether... No, but then why, I have to interrupt you, but we've gone on so long. I want to get to the issue. The issue is, under your reasoning, they would never have put that paragraph in there. But they did. So we can't ignore that. If you're right, then they never would have paragraph 37. And after paragraph 37 is when they make all this argument. So in reply back to paragraph 37, and because you say it comes 39, comes afterwards and so forth, their premises is paragraph 37. And then they go on. And don't forget, this is right after paragraph 34, which says, Ms. Nelson's injury occurred in the performance of an active duty. So, and then they quote the 75%. If you were right, they would have said something about 50% there. But they never... But they don't. Right. But they never analyze whether or not... I mean, I don't believe... Why would they? Why would they? But why would they? Because... Because there's never a discussion in any of this that an analysis under A1. And you're saying, well, they don't even ever have to get to A1 because they've just made the determination under the first paragraph of 154 that she's entitled to that. Again, all of the analysis is about whether or not the injury she experiences was in the performance of a police duty. They don't analyze whether or not that the prior mental condition exasperated her current condition. I mean, they don't do any of the same. But again, it was thrown over the exasperated. That's under the statute. So people have been thrown around this exasperated, but that's not the... Sorry. The result... Sorry. The resulted from analysis in 5-154 A1. Well, it's different than exasperated. I just wanted to... Okay. Sorry. I keep using that just because that's what the Samuels Court uses when they talk about what it means to... That doesn't mean anything. Okay. Fine. But... Okay. Fine. Okay. You may conclude, please. Those are the three points that I wanted to raise, Your Honor. Again, the clearly erroneous standard, great deference to the board. Jurisdiction, again, I think it's very clear. While they analyze some of the same issues that would be analyzed under a 154 A1 context, they don't have that issue in front of them. It was not part of the board's original findings or the circuit court's original order affirming the board. So they didn't have jurisdiction over that issue. And again, they emphasize what Ms. Nelson raised on appeal. After that decision was made, there was, of course, a hearing before the board that was not objected to by anyone where they determined that, yes, she's entitled to a duty disability, but then did that further analysis that's required under the statute. And then three, I obviously did cite the Samuels case, notwithstanding Your Honor's comments. So I apologize for that. No, that's... You don't have to apologize. I want to thank the lawyers for your briefs. Excellent arguments. This is a 40-minute argument that went quite a bit over. So obviously we are engaged, and your arguments engaged us. So we will take that under consideration. Thank you very much, and everyone have a good afternoon. And to Ms. Bachman, good luck with you in the next few weeks.